UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
ROBERT NOWAKOWSKI,

                 Petitioner,

        -against-

PEOPLE OF THE STATE OF NEW YORK,

                Respondent.
------------------------------------------------------x

**MEMORANDUM & ORDER**

13 CV 3709 (RJD)

DEARIE, District Judge.

Following a non-jury trial in the Criminal Court of the City of New York at which he represented himself, petitioner Robert Nowakowski was found guilty of harassment in the second degree, N.Y. Penal Law ("P.L.") § 240.26(1); acquitted of the two more serious charges of attempted assault in the third degree, P.L. §110.00/120/00(1), and menacing in the third degree, P.L. §120.15; and sentenced to one year's conditional discharge. The charges arose out of a complaint by petitioner's apartment house neighbor, a seventy-five-year-old woman (now deceased) who complained that petitioner shoved her while she was feeding stray cats in the yard behind their building. Petitioner has maintained that he was targeted by the victim, other neighbors and local police, all of whom, he asserts, conspired to fabricate the charges.

Before the Court is petitioner's pro se application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He appears to raise the following eight claims: (i) that he was the victim of a false arrest; (ii) that the trial judge "behaved atrociously" toward him; (iii) that the prosecutor suborned perjury and engaged in other trial-related misconduct; (iv) that he was denied his right to a prompt verdict; (v) that he was denied his right to confront witnesses and to present a

defense because he was not allowed to introduce certain impeaching evidence; (vi) that the evidence of his guilt was legally insufficient; (vii) that his motion for collateral relief in state court pursuant to N.Y. Criminal Procedure Law §440.10 was erroneously denied; and (viii) that his appellate counsel was ineffective.[1]

For the reasons set forth below, the application for habeas relief is denied and the petition is dismissed.

**Procedural Background: The Second Circuit Remand**

As the parties are aware, the petition received extensive treatment by the Second Circuit. See Nowakowski v. People of the State of New York, 835 F.3d 210 (2d Cir. 2016). In brief, as detailed there, upon petitioner's conviction in 2008, he was initially ordered to pay a fine of $100; the sentence was then stayed for more than four years while Nowakowski pursued his appellate and post-conviction remedies. Petitioner returned to the trial court on May 14, 2013 and represented that he could not afford the fine and administrative charges (which totaled $195). In response, the court vacated the fine and sentenced petitioner to one-year conditional discharge, which required that he complete one day of community service within the discharge year. Nowakowski, 835 F.3d at 214.

By notice dated June 6, 2013, petitioner was informed that he was required to appear for his community service on July 2, 2013. On July 1, 2013, petitioner filed his §2254 petition here, and the next day performed his service as scheduled. By Memorandum and Order dated May

---

[1] Because petitioner appears pro se, the Court "[construes his] submissions liberally and interpret[s] them to raise the strongest arguments they suggest." Wright v. Comm'r, 381 F.3d 41, 44 (2d Cir. 2004).

30, 2014, following briefing, the Court concluded that the expiration of petitioner's conditional discharge on May 14, 2014 rendered his petition moot.

The Second Circuit reversed. The panel held, first, that petitioner was "in custody" for purposes of seeking §2254 relief because his sentence of conditional discharge and one-day of community service was unfulfilled on the day he filed his habeas petition. Nowakowski, 835 F.3d at 214-217. Second, appreciating that New York classifies harassment in the second degree as a "violation" rather than a "crime," P.L. § 240.26,[2] and that petitioner's sentence expired before his petition was dismissed, the Court held that the petition was not moot because the presumption of continuing collateral consequences still applies to the harassment conviction. Nowakowski, 835 F.3d at 217 et seq.

**Proceedings in the Trial Court**

The testimony at petitioner's trial spanned three days in 2008 (May 30, June 27 and July 17); the court rendered its verdict and imposed sentence sixty-two days later, on September 18, 2008. The prosecution presented two witnesses, the victim Gloria Carey, 77 years of age at the time of trial, and New York City Police Officer Alan Pajak, of the 94th precinct, who responded to the scene, took Carey's complaint, and effected petitioner's arrest.

The Prosecution's Case.

Carey lived in a third-floor apartment at 226 Norman Avenue in Brooklyn and regularly attended to stray cats in the backyard. She set out sleeping boxes for the animals and fed them

---

[2] As the Circuit summarized, New York law "categorizes each offense as one of four types, listed here in descending order of seriousness: a felony, a misdemeanor, a violation, and a traffic infraction. … Of these four, only a felony and a misdemeanor are labeled '[c]rime[s].'" Nowakowski, 835 F.3d at 218-219 (internal citations omitted).

twice a day, every day, for the thirty years she lived in the building. Petitioner lived on the ground floor, with windows facing the yard where Carey fed the cats.

Carey knew petitioner from the time she first moved into the building. Asked to describe her relationship with him, she testified, "There wasn't any relationship." (Tr. 6/27/08 at 62). He often acted in an "obscene" or "[v]ery offensive" manner toward her. Id. at 63. His behavior included "throwing water out the window, obscene gestures, [and] open[ing] the door every time [she] c[a]me down the stairs." Id. Carey opined that petitioner behaved in this way "[m]aybe because [she was] the only one in the house that was there the longest, and [she was] the only one in the house that [ ] won't take it from him." Id. She either "called the police[ ] or argued [herself] with him." Id. On cross-examination, Carey said her relationship with petitioner and his father was "aloof," and that "she tried not to have anything to do with [them] and hoped [they] would do the same but [petitioner] didn't." Id. at 76. Once when some cats had been poisoned Carey suspected petitioner but did not accuse him. Id. at 85. Before this case, Carey had called the police because of petitioner "[n]ot that many" times, filed "about three" police reports, and "only in the last two years because [she] couldn't take anymore," id. although she never sought his arrest before this case. Id. at 76, 101.

On the evening of October 30, 2006, while Carey was in the alley that gave access to the backyard, petitioner "came out of nowhere and attacked [her]." Id. at 64. He shoved her, causing her wrist to make hard contact with a wall, and making her afraid. Id. After the incident, Carey ran into the building where, at some point, she encountered her neighbor Monica Szarjenko, who brought Carey into her (Szarjenko's) apartment because she was upset. From there Carey phoned the 94th precinct.

4

On the evening of October 30, 2006, Officer Alan Pajak responded to a radio call for a dispute at 226 Norman Avenue, arriving there at approximately 7:53 p.m. (Tr. 5/30/08 at 42-48, 74). He interviewed both Carey and Szarjenko in Szarjenko's apartment. Carey "basically told [him] that she had an argument with one of the tenants in the building and that he pushed her and that she was scared." Id. at 49. Because there was no visible physical injury Pajak advised Carey that she had been harassed and he would take a report, but he could not arrest petitioner because the harassment did not occur in his presence. Carey elected not to make a report. Pajak then spoke with petitioner outside his apartment door, advising him to stay away from Carey and Szarjenko.

The next evening (October 31, 2006), at approximately 6 pm, Carey appeared at the 94th precinct "to show [Pajak] a bruise on her left wrist." Id. at 51. Pajak believed the bruise to be consistent with Carey's earlier account of the attack and remarked that in his career he had seen bruises manifest in the first day after an attack. He photographed Carey's arm and had another officer prepare Carey's assault complaint. Id. at 52-58, 80. Pajak then went to Norman Avenue, found petitioner at home, and arrested him.

Of note, issues with Carey's recall of the date and time of the incident were explored at length both on direct and cross. As for the date, in recounting the event almost two years after it occurred, the 77-year-old Carey vacillated between whether the incident occurred on October 30 or October 31, and whether she went to the precinct on the evening it occurred or the next. At one point, Carey bluntly admitted, "I don't remember. . . it's almost two years [ago]." (Tr. 6/27/08 at 69). When the prosecutor, seeking to clarify her testimony, asked Carey if she went to the 94th precinct on October 31, Carey replied, "maybe that's the day I filed the complaint, on October 31?" Id. at 67. After being shown the photographs Pajak took of her injury the night

she went to the precinct, Carey testified, "on here it says October 30, which is what I said from the beginning…but everybody keeps mentioning the 31st." Id. at 68. Likewise, after Carey was unsure when she went to the precinct, the prosecutor asked, "Could it have been the next day?" and Carey responded, "it could have." Id. at 69. At a later point in her testimony, Carey stated again that the incident occurred at approximately 6:30 p.m., that she "hope[d]" that her answers were truthful, but that she "might be wrong on the 30th and 31st." (6/26/08 at 117).

As for the time, Carey initially testified only that it occurred "in the evening" but could not remember the exact time. Id. at 68. She testified, "I usually go down about 6, 6:30 [p.m.] to feed the cats before it gets dark because I'm afraid to go in the yard." Id. During re-cross, the court asked Carey, "Was it light or dark out at the time this happened? This is…end of October, 6:00, 6:30. It would have been on the dark side, right?" Carey replied, "Yeah, that's why I go down." Id. at 123.

The Defense Case.

Petitioner testified in his defense, in response to questions posed by the trial court. (Tr. 6/27/08 at 135 et seq.) He insisted that he did not shove Carey and that he was not even at 226 Norman Avenue at the time Carey claimed the incident occurred and never in the back yard that night. Id. at 134-135, 146. He asserted that on October 30, 2006, between 5:00 p.m. and 5:15 p.m., accompanied by his father, he was at the office of his attorney Andrew Miller. From there, his father and he bicycled to the Western Beef supermarket in Queens, arriving at approximately 6 pm, and made purchases there with both cash and petitioner's debit card. The pair left Western Beef at 6:30 p.m. and did not arrive at the Norman Avenue building until 7:07 p.m. Id. at 134-152. Petitioner sought to introduce receipts from the Western Beef purchase to corroborate that portion of his alibi, but the trial court rejected them because they were not originals.

Petitioner acknowledged that Carey's care of the stray cats disturbed him because it created an unsanitary condition and foul odors outside his apartment windows. Id. at 159. He also claimed that Carey had verbally abused him for thirty years but that he did not once respond to her.[3] Finally, petitioner claimed that his father and he were targets of a 94th precinct conspiracy: among other things, he asserted that the police were trying to ruin their lives in retaliation for past complaints and were using laser weapons to brainwash them. Id. at 155.

Petitioner also elicited testimony from his 77-year-old father, Tadeusz Nowakowski, who corroborated generally the times and locations of petitioner's alibi account but couched the details as approximations and further claimed that because of "brainwash[ing] by . . . intelligence neighbors with electronic devices" he had "lost partial memory." (Tr. 7/17/08 at 10). He also testified, inter alia, that he believed Carey was a federal informant, and that the neighbors collectively were working for a secret organization and spying on him and his son.

In his summation, petitioner reiterated his claim that "th[e] incident was entirely fabricated by" Pajak and Carey. (Tr. 7/18/08 at 15). He also argued, as he does here, that Carey should not be believed because of the inexactness in her recollection ( as noted, whether the incident occurred on the 30th or 31st of October, but also whether she was shoved against a wall or fence, and whether she injured her hand or her wrist).

In its summation, the prosecution emphasized, first, that the inconsistencies in Carey's recollection were attributable to the stress of the event and the passage of time, and in any event

---

[3] The trial court commented during petitioner's testimony that it was "getting the impression here" that "for 30 years you have been battling each other on the premises here, and that's your whole life. Your whole life has been shouting and screaming at each other as antagonistic neighbors." Id. at 167.

inconsequential in light of the police testimony corroborating the matter of the date. Second, the prosecutor offered reasons to question the credibility of the alibi testimony offered by petitioner and his father but asserted that, even credited, their account places petitioner at the Norman Avenue building at approximately the time Carey claimed the incident occurred.

In announcing its verdict, the court stated that it "finds as follows: . . . [a]fter testimony and evidence produced at trial, the Court does not feel that there was sufficient evidence to prove an intent to make any kind of assault on the complaining witness," and so found petitioner not guilty of attempted assault. Similarly, the court "d[id] not think there was sufficient evidence to show any physical menace with the intent to cause harm" and acquitted petitioner of the menacing charge. With respect to harassment, however, the court found the evidence "does show that [petitioner] pushed or shoved the witness which makes out the case for [h]arassment." (Tr. 9/18/02 at 2-3).

**State Appellate and Collateral Proceedings**

On direct appeal, where he was represented by counsel, petitioner claimed, inter alia, that the evidence was legally insufficient, that his conviction was against the weight of the evidence, and that he was deprived of his right to a prompt verdict. In a supplemental pro se brief, petitioner additionally claimed that the state knowingly presented perjurious testimony and that the court erroneously excluded evidence favorable to his defense.[4] The Appellate Term unanimously affirmed petitioner's judgement of conviction. People v. Nowakowski, 30 Misc.3d 138(A), 2011 WL 652747 (N.Y. Sup. App. Term, 11th & 13th Jud. Dist. Feb. 16, 2011).

---

[4] Numerous other claims that petitioner raised in state court that he does not also pursue here on habeas are not mentioned in this memorandum.

Relevant to the claims advanced here on habeas, the Appellate Term held that petitioner's "claim that the Criminal Court's 62-day delay in rendering the verdict deprived him of his right to a prompt verdict" was "unpreserved for appellate review," citing New York's contemporaneous objection rule. Nowakowski, 2011 WL 652747 at *1. The appellate court likewise found petitioner's sufficiency challenge unpreserved, but "[i]n any event" found the evidence "legally sufficient to support the conviction." Id. Further, "in fulfilling [its] responsibility to conduct an independent review of the evidence, [the court] accord[ed] great deference to the factfinder's opportunity to view the witnesses, hear the testimony, and observe demeanor," and was "satisfied that the verdict was not against the weight of the evidence." Id. (internal citations omitted). Finally, the appellate court "considered the additional contentions raised by [petitioner] in his pro se brief" and found them to be "without merit." Id. The New York Court of Appeals denied leave to appeal. People v. Nowakowski, 16 N.Y.3d 898 (2011). In 2012, petitioner returned to the Appellate Term with a motion to reargue his appeal and an application for coram nobis alleging that appellate counsel was ineffective, which that court denied in 2013.

Petitioner also moved pro se, in the trial court, to vacate his conviction pursuant to N.Y. Criminal Procedure Law § 440.10 on the grounds, inter alia, that he was illegally arrested inside his home, that the court erroneously precluded him from introducing certain evidence, that the prosecutor and trial judge engaged in misconduct, and that he was deprived of his right to a prompt verdict. In a written decision and order dated July 10, 2012, the Criminal Court denied the application, finding that the court either lacked jurisdiction to re-hear issues already raised on appeal or that petitioner had otherwise "not met his burden of bringing forth issues sufficient to

create an issue for consideration by [the] court."[5]  By order dated December 7, 2012, the

Appellate Term denied leave to appeal.

Finally, petitioner moved a second time in the Appellate Term for coram nobis relief on

the ground of ineffectiveness of appellate counsel, which was denied on the merits by order

dated October 17, 2013.  The New York Court of Appeals denied leave to appeal the denial of

this second coram nobis.  People v. Nowakowski, 22 N.Y.3d 1140 (2014).


## DISCUSSION

## CONTROLLING LEGAL STANDARDS

### A.    General Standard of Review

A petition for a writ of habeas corpus is not a vehicle for relitigating every issue

previously advanced in state criminal trial or appeal: "28 U.S.C. § 2254 allows a court to

entertain a habeas petition 'only on the ground that [an individual] is in custody in violation of

the Constitution or laws or treaties of the United States.'"  Garner v. Lee, 908 F. 3d 845, 2018

WL 5985932 at *10 (2d Cir. Nov. 15, 2018) (quoting, 28 U.S.C. § 2254(a)).  When, in the

attempt to make that showing, a habeas applicant advances claims that have already been

adjudicated on the merits in state court, relief "shall not be granted . . . unless the adjudication of

the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the

United States; or (2) resulted in a decision that was based on an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

_____

[5] The decision is not reported, but a copy appears in Respondent's Exhibit 4.

These canons "erect[ ] a formidable barrier to federal habeas relief," <u>Burt v. Titlow</u>, 571 U.S. 12, 19 (2013), out of respect for "a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights . . . and are presumptively competent[ ] to adjudicate claims arising under the laws of the United States." <u>Id.</u> at 19. For this reason, the statutory requirements are strictly construed: the "contrary to" and "unreasonable application" clauses of Section 2254 (d)(1) mean that, when advancing a claim of legal error, a federal habeas applicant must show that the state court, in rejecting his claim, either "directly contradict[ed] a holding of the Supreme Court," <u>Evans. v. Fischer</u>, 712 F.3d 125, 132 (2d Cir.) (internal quotation and citation omitted), <u>cert</u>. <u>denied</u>, 571 U.S. 899 (2013), or seriously misapplied a squarely on-point Supreme Court holding. <u>Burt</u>, 571 U.S. at 19-20 (petitioner must "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement'") (quoting, <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011)). In short, "[i]f this standard is difficult to meet—and it is—that is because it was meant to be," since federal courts "will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy." <u>Burt</u>, 571 U.S. at 20 (internal quotations, citations and alterations omitted).

For claims of "unreasonable determination[s] of the facts" under paragraph (d)(2), an applicant bears the additional burden of "rebutting the state court's factual findings 'by clear and convincing evidence.'" <u>Burt</u>, 571 U.S. at 20 (quoting 28 U.S.C. § 2254(e)(1)).[6]

---

[6] The Supreme Court has twice declined to address the relationship between 2254(d)(2) and 2254(e)(1). <u>Burt</u>, 571 U.S. at 18 ("We have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1), and we need not do so here. . . . For present purposes, it is enough

## B.    Procedural Bar: Independent and Adequate State Law Ground

Under a longstanding principle of habeas jurisprudence "a federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule."  Davila v. Davis, __ U.S.__, 137 S. Ct. 2058, 2064 (2017).  This principle "ensure[s] that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism."  Martinez v. Ryan, 566 U.S. 1, 9 (2012) (citing, Coleman v. Thompson, 501 U.S. 722 (1991).

The bar applies "even where the state court has also ruled in the alternative on the merits of the federal claim."  Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990). See also Harris v. Reed, 489 U.S. 255, 264 n. 10 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding") (emphasis in original). But see Garner, 2018 WL 5985932 at *10 ("While a state court may rest its judgment on a state procedural bar if it rejects the merits of a federal claim *only in the alternative*, . . . the Supreme Court has admonished that, when in doubt, courts should presume that the state court adjudicated the claim on the merits.") (internal citations omitted, emphasis in original).  In short, the state court must express the nature of its holding unambiguously.  See id. ("for this procedural default rule to apply, the state court must have clearly and expressly stated that its judgment rested on a state procedural bar . . . In

---

to reiterate "that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance" (quoting, Wood v. Allen, 558 U.S. 290, 293 (2010)).  The Second Circuit has likewise declined to do so. Garguilo v. Heath, 586 Fed. App'x 764, 766 n. 1 (2d Cir. Oct.10, 2014); Jones v. Murphy, 694 F.3d 225, 238 n. 4 (2d Cir.2012), cert. denied, 568 U.S. 1165 (2013).

other words, it must be 'clear from the face of the opinion' that the state court's decision rested on a state procedural bar.") (internal quotations, citations, and alterations omitted).

"To bar habeas review…the state court's decision must rest not only on an independent procedural bar under state law, but also on one that is adequate to support the judgment." Murden v. Artuz, 497 F.3d 178, 191 (2d Cir. 2007) (internal quotation and citation omitted), cert. denied, 552 U.S. 1150 (2008).  A state procedural bar "is 'adequate' if it 'is firmly established and regularly followed by the state in question' in the specific circumstances presented."  Id. (quoting, Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006)).  New York's preservation requirement is considered a firmly established and regularly followed rule sufficient to invoke the "independent and adequate state law ground" bar.  Richardson v. Greene, 497 F.3d 212, 217-18 (2d Cir. 2007).[7]

Finally, "[habeas courts'] function . . . is not to reenact the proceeding or peer over the shoulder of the state court judge ruling on questions of state law . . . Instead . . . we are to determine only whether the state ruling falls within the state's usual practice and is justified by legitimate state interests, not whether the state court ruling was correct."  Downs v. Lape, 657 F.3d 97, 101 (2d Cir. 2011) (internal quotations and citations omitted), cert. denied, 566 U.S. 1014.

---

[7] The "independent and adequate state ground" bar may be bypassed only if a petitioner demonstrates "cause and actual prejudice" for failing to comply with the state rule, or that a lack of federal review will result in a fundamental miscarriage of justice because the petitioner is in fact innocent.  Harris v. Reed, 489 U.S. 255, 262 (1989); Wainwright v. Sykes, 433 U.S. 72, 87 (1977).  As the discussion below shows, neither of these exceptions is implicated here.

## ANALYSIS OF PETITIONER'S CLAIMS

## 1.    False Arrest

Petitioner appears to complain that when arresting him, Officer Pajak entered his apartment without his consent, and that the arrest occurred in response to a complaint that he locked neighbor Szarjenko (not Carey) out of her apartment rather than because of the incident with Carey (which he insists did not occur).  This claim does not present a basis for habeas relief because it is procedurally barred and so not reviewable here: as noted, the state court denied the claim on the ground that it should have been raised on direct appeal.

Even if it were not procedurally barred, the claim would be unreviewable here because it implicates the Fourth Amendment, and alleged violations of the Fourth Amendment are generally not actionable under § 2254.  Stone v. Powell, 428 U.S. 465 (1976).  The exceptions are the rare instances where the state provides "no corrective procedures at all" to redress Fourth Amendment claims, or where the procedures exist but a defendant was "precluded from using [them] because of an unconscionable breakdown in the underlying process."  Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992) (internal citation and quotation omitted).  Neither exception occurred here: New York's corrective procedures to redress Fourth Amendment violations, N.Y. C.P.L. §§710.20 et seq., have been recognized as facially adequate in this context, Walker v. Walker, 259 F. Supp.2d 221, 225 (E.D.N.Y. 2003), and petitioner did not elect to use them to challenge the constitutionality of his arrest.  In any event, petitioner has not pointed to any evidence recovered from his apartment at the time of his arrest and the state did not introduce any post-arrest statements at his trial.

## 2.    The "Atrocious" Judicial Behavior Claim

As a threshold matter, petitioner's claim that the trial judge behaved "atrociously" toward him by, inter alia, shouting at him and intimidating him, is not framed as the violation of any constitutional right.  Afforded the liberal construction due all pro se papers, however, the claim arguably implicates petitioner's right to a fair trial.  Even so, the claim does not present a basis for federal habeas relief because it is unexhausted.  See generally 28 U.S.C. § 2254(b)(1)(A) (district court shall not grant a writ of habeas corpus unless "the applicant has exhausted the remedies available in the courts of the State."); Daye v. Attorney General of State of N.Y., 696 F.2d 186, 191 (2d Cir. 1982) (en banc) (claim that habeas petitioner does not present to state court is unexhausted); Turner v. Artuz, 262 F.3d 118, 123 (2d Cir. 2001) (petitioner must have "fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts") (internal quotation and citation omitted).  Petitioner's challenges in his pro se appeal brief and § 440 motion to the trial court's specific evidentiary rulings is not the same claim as judicial misconduct/fair trial claim he purports to bring here.  See Daye, 696 F.2d at 191 ("[t]he exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts") (internal citation omitted); Boyd v. Saunders, 16 CV 4885 (KAM), 2018 WL 5313763, at *5 (E.D.N.Y. Oct. 26, 2018) (fair presentation in the state courts requires either "explicit constitutional argument" or "alleging facts that fall well within the mainstream of constitutional litigation") (internal quotations and citations omitted).

In any event, the judicial misconduct claim can be deemed exhausted but also procedurally barred because it is entirely record-based and should have been raised on direct appeal; since petitioner has had his one appeal, if he returned to state court to seek to exhaust it by raising it in a subsequent motion for post-conviction relief, the claim would be denied on

procedural grounds.  See N.Y. Crim. Proc. Law ("CPL") § 440.10 (2)(c) (court "must deny" a

motion to vacate when sufficient facts appear on the record to have permitted appellate review of

the claim but defendant failed to raise it in his appeal); Bullock v. Grassiano, 13 CV 5081

(BMC), 2013 WL 5774870, at *4 (E.D.N.Y. Oct. 24, 3013) ("claims that are unexhausted in the

state court may be deemed to be exhausted and procedurally barred if the state court to which he

would be required to present his claim would refuse to hear the claim on state procedural

grounds") (citing, Gray v. Netherland, 518 U.S. 152 (1991) and Bossett v. Walker, 41 F.3d 825

(2d Cir.1994)).

To excuse the default petitioner would have to show either that appellate counsel was

ineffective for failing to raise it, or that failure to reach the claim would be a manifest injustice

because petitioner is actually innocent.  Petitioner makes neither of these showings.  See

discussion infra at and p. 23 (petitioner's sufficiency claim) and pp. 25-27 (the ineffective

assistance of appellate counsel claim).

## 3. Alleged Subornation of Perjury

The basis of this claim is Carey's wavering recollection of the date of the incident (as

discussed, either October 30 or October 31 in 2006).  Further, petitioner references a proceeding

in Brooklyn Housing Court, occurring prior to his trial in criminal court, during which Carey

apparently testified that the incident occurred on October 30, 2006.

The claim is frivolous on its face.  The record shows that Carey did not testify falsely.

The fact that 24 hours separate her initial report of the incident to police and petitioner's arrest

makes it understandable that she might be confused about the dates when recounting them almost

two years later; crucially, however, Carey admitted that she was uncertain, due to the passage of

time, whether the event occurred on the 30th or 31st of October 2006, and in any event, the

essentials were corroborated by Officer Pajak. The eliciting of such testimony is plainly not the suborning of perjury. See, e.g., United States v. Josephberg, 562 F.3d 478, 494 (2d Cir.) ("Differences in recollection do not constitute perjury . . . and when testimonial inconsistencies are revealed on cross-examination, the [fact-finder] is entitled to weigh the evidence and decide the credibility issues for itself") (internal quotations, citations, and alterations omitted), cert. denied, 558 U.S. 965 (2009).

In the rubric of habeas jurisprudence, petitioner raised the suborning of perjury claim in his pro se supplemental appellate brief to Appellate Term where, as noted, it was rejected on the merits. Nowakowski, 2011 WL 652747 at *1. To obtain habeas relief on this claim, therefore, petitioner would have to show that in rejecting it, the Appellate Term contravened or unreasonably applied the holding of a Supreme Court case or made a factually unreasonable determination. This he cannot conceivably do.[8]

**4. The Delayed Verdict Claim**

Petitioner claims that the 62-day lapse of time between the close of testimony and the trial court's rendering of its verdict violated his constitutional right to a prompt verdict. This claim does not present a basis for habeas relief for several reasons.

---

[8] Petitioner's related claim that the prosecutor engaged in "manipulations," "unethical maneuverings" and other misconduct likewise fails to establish a basis for habeas relief. To the extent these allegations advance a claim of prosecutorial misconduct distinct from the suborning of perjury claim, they are procedurally barred under the authorities reviewed above: a prosecutorial misconduct claim broader than the perjury claim appears in petitioner's pro se motion for state post-conviction relief; as noted, however, that motion was denied on procedural grounds—i.e., independent and adequate state law grounds—in that it raised claims that should have been raised on direct appeal.

First, it is doubtful that the claim is exhausted. Although petitioner did argue in his state appellate brief that he was denied a prompt verdict, he cast the claim in exclusively state law terms. He invoked New York Criminal Procedure Law § 350.10[3][d], which outlines the "order of the trial" for bench trials in the local criminal courts; it provides that after closing statements, "[t]he court *must then* consider the case and render a verdict." CPL § 350.10[3] (emphasis added). The New York Court of Appeals explains that the statute requires that a verdict be rendered within a reasonable time. People v. South, 41 N.Y.2d 451, 454-55 (1977). Thus, it appears that petitioner did not fairly present his claim in the required federal constitutional terms.

Construing the materials most favorably to petitioner, however, the presentment requirement is arguably satisfied by petitioner's citation of South inasmuch as that decision contains the following statement: "Although we base our decision in this case on statutory rather than constitutional grounds, *we note that the salutary considerations which undergird a defendant's right to a speedy trial extend in part to his right to a prompt verdict*." 41 N.Y.2d at 455 (emphasis added).

Assuming arguendo the claim is exhausted, it nevertheless would be procedurally barred from review here under the authorities reviewed above because, as noted, the Appellate Term denied the claim on state procedural grounds. Nowakowski, 30 Misc. 3d 138A at *1 ("[Petitioner]'s claim that the Criminal Court's 62-day delay in the rendering of the verdict deprived him of his right to a prompt verdict is unpreserved for appellate review"). Of note, the Appellate Term demonstrated that the preservation requirement is regularly followed in the prompt verdict context by including in its decision citations to three earlier Appellate Term decisions holding that delayed-verdict claims were unpreserved. See id. Petitioner has not

18

shown, nor could he, the requisite cause and prejudice to bypass the procedural bar, so his claim is not cognizable here.

Finally, even if it were reviewable, the delayed-verdict claim would not present a basis for federal habeas relief.  <u>See</u>, <u>e.g.</u>, <u>United States v. Skvarla</u>, 673 Fed. App'x 111, 113 (2d Cir. Dec. 21, 2016) (applying <u>Barker v. Wingo</u>, 407 U.S. 514 (1972), and its progeny, holds that 30-month delay between close of bench trial and verdict, in possession of child pornography case, did not violate defendant's Sixth Amendment right to speedy trial), <u>cert. denied</u>, 137 S. Ct. 1119 (2017).

5. **The Alleged Denial of the Rights to Present a Defense and To Cross-Examine Witnesses**

Petitioner claims that his right to confront the witnesses against him and to present his defense was denied by the trial court's rulings barring him from introducing, for impeachment purposes, (a) Carey's testimony from an earlier Brooklyn Housing Court proceeding that the incident occurred on October 31, 2006 (contrary to her initial account at trial); (b) evidence of what he believes was a false charge Carey lodged against him in 2000; and (c) a tape recording he made of his encounter with Officer Pajak.

These claims were raised in petitioner's pro se supplemental appellate brief and were denied by the Appellate Term on the merits as "the additional contentions raised by [petitioner] in his pro se brief" that the court found to be "without merit."  <u>Nowakowski,</u> 138 Misc. 3d 138(A) at *1.  Petitioner cannot show that in rejecting these claims, the Appellate Term contravened or unreasonably applied Supreme Court law.

With respect to the Confrontation Clause branch of the claim, the controlling Supreme

Court holdings are <u>Delaware v. Van Arsdall</u>, 475 U.S. 673 (1986), and its progeny. That case

teaches the following:

> The main and essential purpose of confrontation is to secure for the opponent the
> *opportunity* of cross-examination. . . It does not follow, of course, that the
> Confrontation Clause of the Sixth Amendment prevents a trial judge from
> imposing any limits on defense counsel's inquiry into the potential bias of a
> prosecution witness. On the contrary, trial judges retain wide latitude insofar as
> the Confrontation Clause is concerned to impose reasonable limits on such cross-
> examination based on concerns about, among other things, harassment, prejudice,
> confusion of the issues, the witness' safety, or interrogation that is repetitive or
> only marginally relevant. And as we observed earlier this Term, the
> Confrontation Clause guarantees an opportunity for effective cross-examination,
> not cross-examination that is effective in whatever way, and to whatever extent,
> the defense might wish.

475 U.S. at 678-679 (internal citations, quotations, and alterations omitted) (emphasis added).

The Supreme Court found that the defendant in that case was denied his confrontation right only

because the trial court "prohibited *all* inquiry" on a subject relevant to credibility. <u>Id.</u> at 679

(emphasis in original). <u>Accord</u> <u>Davis v. Alaska</u>, 415 U.S. 308 (1974) (refusal to allow any

defense inquiry into key prosecution's witness's adjudication as a juvenile delinquent denied

defendant his constitutional right to confront witnesses).

By contrast, the Supreme Court was explicit about the limits of its Confrontation Clause

jurisprudence, having announced that "this Court has never held that the Confrontation Clause

entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes." <u>Nevada</u>

<u>v. Jackson</u>, 569 U.S. 505, 512 (2013) (emphasis in original).

The Appellate Term did not contravene or misapply Supreme Court Confrontation Clause

holdings when it rejected petitioner's claim that evidence of impeachment was wrongly

excluded: as the trial record shows, petitioner did cross-examine both Carey and Pajak

extensively.  See Tr. 5/30/08 at 63-101 (Pajak cross), 6/27/08 at 18-57 (Pajak cross continued), 6/27/08 at 72-116 (Carey cross), and 6/27/08 at 118-126 (Carey re-cross).

Even if petitioner's confrontation rights had been less than fully protected, there would still be no basis for habeas relief because any such error would have been harmless.  See Van Arsdall, 475 U.S. at 684 ("hold[s] that the constitutionally improper denial of a defendant's opportunity to impeach a witness…, like other Confrontation Clause errors, is subject to [ ] harmless-error analysis"); Brecht v. Abrahamson, 507 U.S. 619, 622 (1993) (holding that, in habeas proceedings, "the standard for determining whether a conviction must be set aside because of federal constitutional error" is whether that error "'had a substantial and injurious effect or influence in determining the jury's verdict.") (internal quotations and citations omitted); Fry v. Pliler, 551 U.S. 112, 121-22 (2007) ("hold[s] that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in Brecht [ ] whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman [v. California, 386 U.S. 18 (1967)]").

Any arguable limitation on petitioner's efforts to impeach Carey and Pajak could not have had a substantial and injurious effect on the verdict here, particularly because the trial judge was also the factfinder, and because petitioner, representing himself, conducted the cross-examinations himself, testified in his own defense, made opening and closing statements, and regularly voiced his arguments and theories of the case within and outside of these formal trial frameworks.  The factfinder could not conceivably have been in the dark, or misled, about petitioner's position with respect to witness credibility or any other feature of his defense.

21

Although cast in a slightly different vocabulary, analysis of the right to present a defense largely mirrors Confrontation Clause analysis here and requires only minimal discussion. The Supreme Court has recognized that "[w]hether rooted directed in the Due Process Clause of the Fourteenth Amendment…or in the Compulsory Process or Confrontation clauses of the Sixth Amendment…the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (internal quotations and citations omitted). "Of course, the right to present relevant testimony is not without limitation" and "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." Rock v. Arkansas, 483 U.S. 44, 55 (1987).

The procedural posture of the claim aside, the trial judge did not deny petitioner his constitutional right to present his defense when making the evidentiary rulings challenged here. First, although petitioner was precluded from introducing Carey's Housing Court testimony about the incident, he was permitted to cross-examine her on it. Second, sustaining the prosecution's objection to petitioner's question to Carey about a false report she allegedly filed against him six years earlier was well within the trial court's discretion, and in any event, the court had already discerned that petitioner's and Carey's thirty-year relationship was mutually antagonistic. Finally, the trial court reasonably exercised its discretion in excluding petitioner's audio-tape of his encounter with Officer Pajak: the court expressed a legitimate concern with the item's authenticity, a valid preference for the live testimony of the taped conversation's participants (Pajak and petitioner) and, in any event, afforded petitioner latitude in cross-examining Pajak about their encounter. In addition, as already noted, petitioner's defense was presented fully and emphatically, through his own testimony, his opening and closing statements,

his cross-examination of witnesses, and his informal remarks to the court throughout the proceedings.

## 6.    Insufficiency

Petitioner's claim that the evidence was legally insufficient to support his conviction does not present a basis for habeas relief.  First and foremost, under the authorities already discussed, the claim is barred from review by this Court because the Appellate Term rejected it as unpreserved, an independent and adequate state law ground; the fact that the Appellate Term rejected the claim on the merits, in the alternative, does not lift this important procedural bar.

In any event, even if the claim were not barred, the Appellate Term's rejection of the claim was not an unreasonable application of controlling Supreme Court law, or factually unreasonable.

The applicable federal sufficiency law is well-established:

the critical inquiry ... does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.

Jackson v. Virginia, 443 U.S. 307, 318-319 (1979) (internal quotations and citations omitted) (all emphases omitted).  See Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (reaffirming that Jackson v. Virginia controls in § 2254 context).

In short, under Jackson, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear

in the record—that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution." Id. at 326. Where the state has first rejected the sufficiency claim on the merits, federal habeas deference is doubled. Cavazos, 565 U.S. at 2 (the "the deference to state court decisions required by § 2254(d)" is to be "applied to the [ ] already deferential review" of Jackson").

These standards foreclose any possibility of granting habeas relief on petitioner's sufficiency claim. The gravamen of petitioner's claim is that the testimony of Carey and Pajak should not be credited whereas his and his father's accounts should. But this Court's review begins with the uncategorical presumption that the trial judge believed the prosecution witnesses and drew all reasonable inferences in the prosecution's favor.

Under New York law,

> A person is guilty of harassment in the second degree when, with intent to harass, annoy, or alarm another person:
>
> 1. He or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same…

P.L. § 240.26(1).

Notably, the key factual question before the trial court was not, for example, whether there occurred some kind of *accidental* physical contact, or whether the circumstances otherwise indicated a lack of intent to harass, which might lead to a different evidentiary discussion, but simply whether the incident, as generally recounted by Carey, did or did not occur. The mandatory Jackson presumption—that the factfinder believed the prosecution witnesses and drew all reasonable inferences in their favor—ends the discussion: Carey's testimony, if credited, plainly establishes petitioner's guilt on the second-degree harassment charge. The state court's

rejection of petitioner's sufficiency claim, therefore, was neither an unreasonable application of Supreme Court law nor factually unreasonable.

## 7. The Denial of His Motion to Vacate

Petitioner casts as a separate ground for habeas relief the claim that the trial court unreasonably denied his motion for post-conviction relief pursuant to C.P.L. § 440.10. As framed, however, the claim is not a cognizable, free-standing habeas claim. The separate claims raised in the 440 motion have already been addressed here, with the exception of one, framed as "newly discovered evidence," in which petitioner asserts that he discovered that the trial court allegedly did not order the trial transcripts. Petitioner's alleged discovery, of course, is not "evidence" that would have been received at his trial; in any event, a claim based on newly discovered evidence is not a ground for federal habeas relief. Herrera v. Collins 506 U.S. 390, 400-401 (1993).

## 8. Ineffective Assistance of Appellate Counsel.

Petitioner claims that appellate counsel was ineffective because, inter alia, (i) he failed to argue that petitioner's conviction was procured by misrepresentations and/or fraud on the part of the trial court and the prosecutor, (ii) he failed to raise any constitutional or federal deprivation of petitioner's rights, such as Due Process or Equal Protection,[9] and (iii) he failed to prosecute a speedy trial claim based on the pre-trial phase of the proceedings.

---

[9] On the subject of equal protection, petitioner complains, inter alia, that he was treated differently than other defendants because of the advanced age of the complaining witness and that, unlike other defendants, he had to wait two months for a verdict. These allegations do not involve classifications or rights triggering equal protection analysis.

Because the Appellate Term denied this claim on the merits, petitioner must show that that denial reflects an unreasonable application of Strickland v. Washington, 466 U.S. 668 (1984).  See Smith v. Robbins, 528 U.S. 259, 285-86 (2000) (Strickland is the proper standard to apply to claims of ineffective assistance of appellate counsel).

To establish ineffectiveness under the Strickland two-part test, a defendant must show that "his counsel's representation fell below an objective standard of reasonableness," measured under "prevailing professional norms," id., 466 U.S. at 687–88 and that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Id. at 692.  A court must be "highly deferential" by presuming that counsel's conduct falls within the range of reasonable performance.  Id. at 689.  Appellate attorneys "need not (and should not) raise every non-frivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."  Smith, 528 U.S. at 288.  See also Jones v. Barnes, 463 U.S. 745, 751 (1983) (appellate counsel not required "to press nonfrivolous points, . . .  if counsel, as a matter of professional judgment, decides not to present [them]").  But see Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.) (omission of "significant and obvious [appellate] issues while pursuing those that were clearly weaker" can be ineffectiveness), 513 U.S. 820 (1994).

Additionally, "[because] [t]he standards created by Strickland and § 2254(d) are both highly deferential, . . . when the two apply in tandem, review is doubly so."  Harrington, 562 U.S. at 105 (internal quotations and citations omitted). Accord Cullen v. Pinholster, 563 U.S. 170, 190 (2011) ("review of [a state court]'s decision is . . .  doubly deferential [because] [courts] take a highly deferential look at counsel's performance [under Strickland] through the deferential lens of § 2254(d)") (internal quotations and citations omitted). Therefore, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether

there is *any* reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard."
<u>Harrington</u>, 562 U.S. at 105 (emphasis added).

Here, the answer to that question is unquestionably yes. Appellate counsel filed a seventy-page brief that casts the facts in the light most favorable to petitioner: it is highly attentive to record detail, underscores every arguable deficiency or inconsistency in Carey's testimony, and offers reasons to credit the accounts of petitioner and his father. The brief also zealously argues, with copious legal authorities, three grounds for reversal, namely, that the accusatory instrument was facially insufficient; that the verdict was not supported by legally sufficient evidence and was against the weight of the evidence; and that there was unjustifiable delay in rendering the verdict. Finally, the claims petitioner faults counsel for not advancing are plainly frivolous or unsupported by the record. In short, petitioner's ineffective assistance of appellate counsel claim fails because he cannot conceivably demonstrate "deficient" performance. <u>See</u> <u>Strickland</u>, 466 U.S. at 697 ("there is no reason for a court deciding an ineffective assistance claim . . . even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

Were it necessary to reach <u>Strickland</u>'s prejudice prong, the Court would conclude that petitioner was not prejudiced by the alleged omissions of appellate counsel. Petitioner filed a pro se supplemental brief and could have raised the omitted claims there; more critically, he cannot show that the outcome of his appeal would have been different had the omitted claims been pursued because, as noted, those claims are either frivolous or unsupported by the record.

## CONCLUSION

For all the foregoing reasons, Robert Nowakowski's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied in its entirety. Further, Nowakowski has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), so a certificate of appealability will not issue.

SO ORDERED.

Dated: Brooklyn, New York
          December 6, 2018

s/ Raymond Dearie
_____
RAYMOND J. DEARIE
United States District Judge
